Thank you, Your Honor. May it please the Court. This case perhaps lacks the complexity of the last one. The issue that we've raised is whether a reasonable person who's been instructed to stay across the street from his home, handcuffed, has several law enforcement officers, an increasing amount, arrive, and then it is read his Miranda rights, would think that he is not free to leave after brief questioning. Is that, in fact, a de facto arrest, which causes the Fourth Amendment to come into play, as well as the fruit-of-the-poisonous-tree doctrine and suppression of evidence? Could I ask you to just be sure in your argument at some point to address whether that whole issue of, did the stop ripen into arrest, can be bypassed by addressing whether there's probable cause to seize him? Sure. And that was raised very briefly by the government in their brief. It certainly wasn't considered by Judge Van Sickle below. The parties treated this case as one of a Terry stop up until the search warrant was applied for. I realize that, but we typically can affirm for any reason supported by the record. And maybe if we were viewing the case that way, we'd require a supplemental brief. But we might not. So I'd suggest you address that one today. I understand, Your Honor. Your Honor, I think that Judge Van Sickle looked at this issue. If you read Judge Van Sickle's order, he looked at first whether or not there was a stop or a de facto arrest. He thought the handcuffing was appropriate under the circumstances, didn't address the Miranda. We actually don't think that the handcuffing was appropriate under the circumstances. There wasn't a crime of violence that was under investigation, such as the robbery cases that are cited to the court. Mr. Robledo was compliant. He'd moved across the street. He was, in fact, backing away from the truck in question. That was the source of concern. Just as in Gant, that a person who has been secured away from their car is not at risk of reaching into the car and grabbing a gun, in this case with Mr. Robledo across the street having shown that he was not himself armed, there wasn't a reasonable fear that he was going to grab a gun at a moment's notice. He was not acting evasive. So we don't think the handcuffing was appropriate, but there were other factors as well. So then the question becomes, okay, if this was an arrest, was there probable cause? Judge Van Sickle talked about the issue of probable cause in the context of the search of the truck. There was actually a search warrant for that truck. And below it had been contested whether or not there was probable cause for that search warrant and the search of the truck. Judge Van Sickle said yes, and he relied heavily on the statement that Mr. Robledo made, the statement that was made after he was read his Miranda rights, after he was handcuffed, after he was subjected to the de facto arrest. And Judge Van Sickle found that the difference between Mr. Robledo's statement, which had detailed knowledge of the gun, and Ms. Cervantes' statement where she said the gun was her father's, showed that there was probable cause to think that Mr. Robledo was associated with that gun. But it does not appear to me from reading the order that Judge Van Sickle believed there was probable cause before that. And I think that that's right. There was certainly suspicion, but there was not probable cause. And this Court's cases also look at the circumstances and whether or not more investigation can easily be accomplished prior to an arrest in the analysis of whether or not there's probable cause. And the Dega deal- Excuse me. Early on in the dealings between law enforcement and your client, wasn't he asked whether he had a firearm? He was asked whether or not shots had been- he'd heard shots fired. And if he had a gun. And I think he volunteered, I wouldn't have a gun because I have a felony. Not me. I'm a felon. That would be against the law. Right. And he picked up his shirt and showed that he didn't have a gun. Okay. I'm not saying that the government says- Do you think that's admissible? Admissible? That statement. At trial? Yeah. That was before- I think that there were grounds for- I think things evolved. It's voluntary, isn't it? It's voluntary. We haven't contested that statement. I think that things evolved. So at this point, law enforcement knows that they're dealing with a felon. Correct. A man with a felony conviction. And they know that some shots have been fired. Correct. And they have a suspicion that perhaps the weapon used has been placed in the bed of the truck. They have a suspicion, but it's just a suspicion. They don't know that Mr. Robledo is that person. They need to have probable cause. Not only that a crime was committed, but it was Mr. Robledo that committed that crime. They have no interest in ensuring their own safety and the safety of surrounding individuals? Sure they do. Sure they do. And we're not saying that they couldn't do a Terry stop. I think especially when Mr. Robledo said he began acting suspiciously, that what was a consensualist encounter- But your position is under these facts, he was actually placed under arrest. Not at that point in time. It was- He was handcuffed? When he was handcuffed and read- And put on the other side of the road? And certainly- and for purposes- At that point, he was under arrest. Yeah. For purposes of- once he was read Miranda, that sort of capped it. With all those circumstances together- At that point, did the officers have probable cause to arrest? At that point, the officers did not have probable cause to arrest. That was before Mr. Robledo made the statements that Judge Van Sickle found were so critical in determining that it was Mr. Robledo to associate with the gun. Now, more investigation- he wouldn't have made those statements. More investigation could have been taken, and this Court's case law would suggest it should have been taken before probable cause analysis could come to fruition. The officers did eventually call the neighbor to the scene to make an identification. The neighbor wasn't able to identify someone one way or the other, but that's something that could have been done- is often done in these sorts of circumstances where someone is detained and a witness is brought to the scene to say, is this the person you saw? They could have also walked up to the truck and looked in to see where Mr. Robledo had thrown something to see if they could see a gun in plain view. And there actually was no gun where they had seen him throw something and retrieve keys. But there are things that they could have done to dispel or confirm their suspicions. But at the point in time that we're talking about, it was just a Terry stop. There was not probable cause to arrest. And so the circumstances under the Fourth Amendment would warrant suppression of the evidence taken from Mr. Robledo at that point in time. Statements made by other people are obviously not something that we can suppress. So the statements by his girlfriend or what have you would not be subject to suppression. At what point did they know there was a gun in the truck? Not until- I don't think that they know the gun is in the truck until- definitely not after they talk to Mr. Robledo. I don't think that it's until after they get the telephonic search warrant for the truck. But Mr. Robledo, during his statement, provided precise information as to where the firearm was. If there's nothing further at this point, I'll reserve the remainder of my time. That's fine. Thank you. Okay, Mr. Hamlin. May it please the Court, Tom Hamlin, appearing for the United States. I'd like to start where Defense Counsel left off. When exactly did the officers know there was a gun in the truck? It was well before the execution of the search warrant. In this particular case, Officer Aikens was flagged on by the motorist, told of gunshots for being fired. Officer Aikens arrives at 571 Peach Road in approximately one minute after he gets the information. Officer Aikens is familiar with the house due to past experience. He's worked as a Grandview police officer for 20 years. He knows that this house is associated with acts of violence. He's arrested a homicide suspect in the past. He goes out to the house. He has this brief conversation with Mr. Robledo, and then he decides, well, I'm going to contact other people to see if anyone else hears gunshots. He contacts Ms. Cervantes, who's inside of the house. She also provides a telephone to Mr. Robledo, and he's obviously not in custody. He's walking around talking on the telephone, and the court observed having a private conversation, not in custody by the police. As Officer Aikens continues his investigation, handcuffs are not applied. He asks the folks to step across the street so he can continue his investigation. He then observes Ms. Cervantes have a brief conversation with Mr. Robledo. It was at that point that Ms. Cervantes advised Officer Aikens there's a gun inside of the truck. So that's when the officers first found out that there was a gun inside of the truck. And Officer Aikens testified at the suppression hearing that he believed that he had probable cause at that point because he knew gunshots had been fired. He knew that a male had been firing the gun in the driveway of 751 Peach Road. He arrived one minute later, and there was only one person that was found in the area, and it was Mr. Robledo, a person who had identified himself as a convicted felon. This court has recognized that there are circumstances which allow an officer or police officers to engage in more aggressive conduct, such as placing handcuffs on an individual or pointing a firearm at an individual when they're conducting a terrorist stop or investigative detention. For example, in the Miles case where officers were aware that an individual had fired gunshots at a house, there was only one person matching that description in the area, this court found it was reasonable for the officers to hold him at gunpoint, have him back down off a porch, have him kneel down, and then place handcuffs on him. In Batista, that was also a case where officers were aware of a bank robbery that had occurred, and they stopped individuals that matched the description of the bank robbers, and it was permissible for them to handcuff those folks because they believed they were at risk of flight. And this court has repeatedly determined that the factors to consider are risk of flight and officer safety. Here, Officer Aikens testified in regards to his concerns for officer safety, his experience with knowledge of the house, and most importantly, he testified about risk of flight. He testified that Mr. Robledo appeared to be nervous. He appeared to be fidgety. He testified that Mr. Robledo appeared to be looking for avenues of escape. So he believed that based upon the totality of the circumstances, his training and experience, and what he's observing at the scene, that Mr. Robledo posed a risk of flight. The argument from the other side is that Mr. Robledo was in custody. He was under arrest. This court has determined there are a number of factors to consider when determining whether or not a person is in custody. And the government submits to the court. Would he have felt free to leave? Whether or not he felt free to leave, and this court has determined that when you're looking to see if someone is free to leave, there's a number of factors that the court should consider. And the government's position is all of those factors cut in favor of the government in this case. Those factors are the language used by the officer to summons the individual. In this case, at the suppression hearing, all the officers testified as to a casual conversation. There was no yelling. There was no threatening. There were no guns drawn. The second factor is whether or not the defendant was confronted with evidence of guilt. He wasn't. Third, the physical surroundings. It's true that there were numerous officers that had arrived as the situation developed. But on the other hand, the defendant is permitted to use his phone. He's on the telephone. He's with his girlfriend. He's with his girlfriend's brother across the street from the house. This certainly is not a dominated police setting like a police station. The government would suggest that this isn't that type of situation. So I have a question. Yes, Your Honor. I always have difficulty conceptually in the extended Terry stop type cases. It's how, understanding, how could a guy feel free to leave if he's handcuffed? At that point, he wouldn't, correct? I understand the court's concern, but this court has previously determined that handcuffing does not per se mean that an individual is in custody. So I don't believe that handcuffing by itself would render a person feeling that they're not free to leave, whereas the district court stated in his opinion people who are under arrest are always handcuffed, but not all people handcuffed are always under arrest. Well, he wouldn't be free to walk away with the handcuffs on. No, he wouldn't be free to leave. And, you know, when the officers are conducting a Terry stop and then investigate a detention, normally the person is not free to leave. Until they complete? Their investigation. And in this case, that's exactly what the officers were doing was attempting to conduct their investigation in the least intrusive means possible. There were only a few things that Officer Eakins could do. He could contact witnesses, which is what he did. He contacted Mr. Bontes, the other guy in the house, and Mr. Castle, and he was aware the defendant had stated he didn't live at the house, but then he started drawing a line in the sand saying he did live on the house, that he had an expectation of privacy on the property. So Officer Eakins' only other option was to apply for a search warrant, and they quickly applied for a telephonic search warrant and then executed that search warrant. And the court has questions of me. I don't have any further questions. Judge Noonan? No, no questions. And Judge Hawkins? No questions. I have no questions. Thank you. Okay. Briefly, I don't know that there is a reasonable person who would think while handcuffed and told by a police officer, you have a right to remain silent, anything you say can and will be used against you in the court of law, et cetera. I don't think there is a reasonable person in this country who would not think, oh, jeez, I'm being arrested. And that's the test. Would a reasonably innocent person think that this is not just a temporary detention, but that I'm actually being arrested? And most people understand that that reading of Miranda, especially in circumstances such as this, is a warning that you're being arrested. A reasonable person in this circumstance would believe that they were being arrested. Even if handcuffs were appropriate, even if handcuffs were appropriate, BAM transformed it. We don't think handcuffs were appropriate. This wasn't a crime of violence situation. This was a rural area where there was an allegation that someone was shooting a gun on a driveway. I'm not even sure that that's illegal behavior, let alone a crime of violence. So it's a very different circumstance. Mr. Robledo was compliant. He may have been fidgety. He was nothing more than fidgety. He did not ever try to run, and when asked to do things, he did them. So there wasn't a reason to have the type of aggressive stop that sometimes is necessary. This court frequently says that handcuffs generally have no place during a routine Terry stop. They need to be justified, and they weren't justified in this case. So perhaps the real question is probable cause, and I would ask the Court to look at Judge Van Sickle's order where he talks about the difference between when there was a Terry stop and when there was arrest and how, for him, and to the extent that it's a part legal, part factual analysis, for him it was the statement that Mr. Robledo made after his de facto arrest, our opinion de facto arrest, that was critical to the finding of probable cause. Without that, there wasn't probable cause. It was suspicious. We're not saying it's not suspicious, but it wasn't probable cause to believe Mr. Robledo had committed the crime. One other fact, I don't think that the allegation from Mr. Castle was specific as to the beginning, as to if it was male or female, but there were two males seen at the scene. And if there's no further questions. I notice from the docket sheet it says, Yakima, is that where your office is? That's where the office is. That's where we live. Is that just you? No. We actually have five attorneys, I think, in Yakima. Okay. All right. Thank you for coming in today. Thank you, Your Honor. It's a nice drive. It is, except for through Mercer Island. I once tried a case in Yakima. I had to drive every day. I didn't go there for the week. Oh, my. But I liked it. Oh, my. In front of Judge McDonald? Great. Great. Thank you, Your Honor. Thank you. Submit. Okay. And wait one second, advocates. I want to make sure. Judge Noonan, did you have anything else? No. Okay. Thank our advocates who, as Daniel Webster once said, have the great power of clear statement. You've both done excellent jobs in presenting your cases. Thank you. Thank you both.
judges: NOONAN, HAWKINS, GOULD